# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

---

| | |
|---|---|
| TABITHA MARIE SMITH (deceased) (a/k/a Tabatha Marie Colbaugh) by and through her surviving children Nathan Alexander Smith, JE through next friend JH, NR through next friend SR, and LC through next friend EH, | No. 1:24-cv-151-DCLC-CHS<br>Jury Demanded |
| and | |
| NATHAN ALEXANDER SMITH, JE through next friend JH, NR through next friend SR, and LC through next friend EH (individually), | |
| Plaintiffs, | |
| vs. | |
| MEIGS COUNTY, and the ESTATE OF ROBERT J. LEONARD (Deceased), by and through Neal Pinkston as Administrator ad Litem, | |
| Defendants. | |

---

Decatur, Tennessee
July 16, 2026

DEPOSITION OF AGENT CORTNEY DUGGER

MAY CONTAIN CONFIDENTIAL INFORMATION PURSUANT TO COURT ORDER

---

APPEARANCES:

FOR THE PLAINTIFF NATHAN SMITH:

ROBIN R. FLORES, ESQ.
Flores Law Office
4110 Brainerd Rd., Su A
Chattanooga, TN 37411
(423) 267-1575
robin@robinfloreslaw.com

FOR THE MINOR PLAINTIFFS:

ALYSON OLIVER, ESQ. (Remote)
Oliver Bell Group
50 W. Big Beaver Rd, Ste 200
Troy, MI 48084
(248) 327-6556
aoliver@oliverlawgroup.com

FOR THE DEFENDANT ESTATE OF ROBERT LEONARD:

BRYAN HOSS, ESQ. (Remote)
Davis & Hoss P.C.
850 Fort Wood Street
Chattanooga, TN 37403
(423) 266-0605
bhoss@davis-hoss.com

FOR THE DEFENDANT MEIGS COUNTY:

ALIX C. MICHEL, ESQ. (Remote)
DAVID J. WARD, ESQ.
Michel and Ward
735 Broad Street, Suite 406
Chattanooga, TN 37402
(423) 602-9521
david@michelandward.com
alix@michelandward.com



APPEARANCES (Cont'd):

FOR GARMIN INTERNATIONAL:

DONALD J. KELLY, ESQ. (Remote)
Bricker Graydon Wyatt
400 West Market Street, Su 2000
Louisville, KY 40202
(502) 562-7327
dkelly@bricker.com

FOR THE WITNESS:

HUNTER HINTON, ESQ.
Assistant Attorney General
Law Enforcement and Special
Prosecution Division
500 Dr. Martin L. King Jr. Blvd.
Nashville, TN 37243
(615) 253-3441
hunter.hinton@ag.tn.gov




AGENT CORTNEY DUGGER:

| | |
|---|---|
| Examination by Mr. Flores | 7 |
| Examination by Mr. Kelly | 102 |
| Examination by Mr. Ward | 132 |
| Examination by Mr. Hoss | 154 |
| Re-Examination by Mr. Flores | 163 |
| Re-Examination by Mr. Ward | 167 |
| Further Re-Examination by Mr. Flores | 172 |
| Re-Examination by Mr. Kelly | 175 |

INDEX TO EXHIBITS

| No. | Description | Page |
|---|---|---|
| 36 | Agent Dugger's list of trainings (Late filed) | 16 |
| 37 | Agent Dugger's Report of Forensic Findings | 26 |
| 38 | AG Russell Johnson's Summary Report | 27 |
| 39 | Agent Dugger's 2/21/24 Report of Investigation | 27 |
| 40 | Chain of custody list for Garmin device (Late filed) | 45 |
| 41 | Signed affidavit to seal autopsy (Late filed) NOTE: May be a confidential document | 89 |
| 42 | Addendum to Meigs County Grand Jury Report of Monday, November 25, 2024 | 161 |
| 43 | Agent Dugger's approximation of where the “arrest” text was sent (Late filed) | 171 |


* * *



D I S C L O S U R E
STATE OF TENNESSEE
COUNTY OF HAMILTON
DEPONENT: AGENT CORTNEY DUGGER

Pursuant to the Rules and Regulations of the Tennessee Board of Court Reporting, I make the following disclosure:

I am a Tennessee Licensed Court Reporter. I am here as an independent contractor for Wilson Reporting Agency.

Wilson Reporting Agency was contacted to provide court reporting services for this deposition. Wilson Reporting Agency will not be taking this deposition under any contract that is prohibited by TCA 24-9-136.

Wilson Reporting Agency has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Wilson Reporting Agency will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Sheila D. Wilson, LCR#268
Expiration date: June 30, 2028


Case 1:25-cv-00050-DCLC-CHS Document 63-4 Filed 10/15/26 Page 3 of 9
PageID #: 647

The deposition of AGENT CORTNEY DUGGER, taken on the 16th day of July 2026, on behalf of the Plaintiffs, beginning at approximately 10:06 a.m., in the Meigs County Courthouse, 7214 SR-58, Decatur, Tennessee, before Sheila D. Wilson, Licensed Court Reporter #268, and Notary Public.

This deposition is taken pursuant to the terms and provisions of the Federal Rules of Civil Procedure.

Signature of the witness is reserved.

/ / /



AGENT CORTNEY DUGGER,
called as a witness at the instance of the Plaintiffs, having been first placed under oath, was examined and testified as follows:

EXAMINATION

BY MR. FLORES:
Q Good morning, Mr. Dugger. My name is Robin Flores. I represent Nathan Smith, who is one of four of the surviving children of the deceased, Tabitha Smith. My co-counsel is not here today. That's retired judge Neil Thomas and Mike Thomas.
I'm handling the deposition for Mr. Smith. I'm also going to be the only one asking you at this point. On Zoom we have Attorney Alyson Oliver out of Michigan. She represents the other three minors.
Have you -- prior to today have you ever participated in a deposition?
A I have. It's been a number of years ago.
Q And I just want to give you a little bit of ground rules to start with. Today's not -- it's not a marathon. So if you need to take a break, just let me know.
A Okay.
Q If I ask any questions of you, just wait until I finish asking the question before you answer. And I promise you that I'll give you all the time you need --



A Okay.
Q -- to get your answer in. If you need time to look at and read some documents or think about your response, don't worry about how it's going to look on the deposition, the transcript. It's not going to show question, blah, blah, blah, and then long pause, then answer.
A Okay.
Q If there's anything that I ask of you that you don't understand, ask me to clarify it.
A Sure.
Q It's not a gotcha session. I just want to know what you know.
Do you have any questions at this point?
A No. I think I'm good.
Q Prior to today what -- well, let me back up. Go ahead and give us your full name. Let's get the spelling, for the court reporter, and your current position of employment.
A Okay. Cortney, C-o-r-t-n-e-y; middle name is Egan, E-g-a-n; last name Dugger, D-u-g-g-e-r.
And my employment is, I'm an administrator and an agent for the Ninth District Attorney's Office, and I'm currently a full-time task force officer for the Federal Bureau of Investigation.



Q Can you explain to us what you mean by a task force officer with the FBI?
A Sure. I'm employed by the State of Tennessee, and I am assigned and allowed to work -- I'm considered full time, which is 30 hours or better, with the FBI. So, essentially you're given the same duties and responsibilities of an FBI special agent while you remain employed at your home agency.
Q And your employment with the Ninth Judicial District, what are your duties there?
A I investigate crimes. I specialize in Internet crimes against children. That's probably what I spend the bulk of my time doing. I do get other general assignments, assist other agencies in their investigations. We initiate our own investigations. Really anything that comes through the door in the Ninth District, you know, we might be involved in.
Q How long have you worked for the -- I'm just going to say the district attorney.
A Yes, sir.
Q How long have you worked for the district attorney?
A Since November 2010.
Q And prior to that, what employment did you hold going -- what was your employer prior to 2010?

correct?
A Correct.
Q And that doesn't mean you're using the device to try to go from the bridge to the jail or from home to the Walmart or anyplace else, correct?
A Correct.
Q I mean, if it's on, it's beaming up and down and saving data.
A Correct.
Q And that's what the drive logs show you, correct?
A That's correct.
Q But you didn't make any attempt to determine whether or not the data available from the file can show, one way or the other, as to whether he was actually engaging it in a route mode, saying, for instance, get me to the Tri-County bridge from his house, or get me from the Tri-County bridge to the jail. You simply didn't make that determination.
A Correct.
Q Are you aware that that determination can be made?
A So, from memory and looking, there is a database file in here that might could store that information.
Q Okay. It just wasn't a concern of yours.
A Correct.
Q Okay. That's fair. And I started this



conversation about the BaseCamp and whether or not you had used that before. Let me try to go back to that.
And you'd said you wouldn't know what to do with the maps. When you download data, you're basically downloading X's and zeros, aren't you?
A Yes.
Q And so you've got to put it into something to have any meaning -- I mean, like, for instance, if we just look at page -- well, the bottom of page 25 of your report, which is the beginning of your log of the routes from that night, correct?
A Yes.
Q You don't download that log from this device, do you? You download, like, X's and zeros and you plug it into something that then can tell you these things, correct?
A I think these all come from a GPX file, which is, I think, a standard -- a semi-standard file with global position systems.
Q Right. And from that, because it knows where it is at any given time and it knows the time, a program that you can use can tell you how fast the car -- how fast the device is moving, correct?
A Correct.
Q So it's just storing time and location, and some



other program then can say, okay, here's how far it went between those two times, and therefore that's how fast it was going, because we know the distance and we know the times?
A Correct.
Q But you're not actually downloading that information. You're just downloading X's and Y's that tell you exact coordinates that could be interpreted to tell you where it is and what time it is, right?
A Correct.
Q Okay. And you used BaseCamp to kind of look at this on a map-type setting, correct?
A Correct.
Q And you could've used Google Earth just as easily, correct?
A I did. And I did use Google Earth some.
Q Okay.
A But as far as the presentation and ease of use, in my business in general, if you're on a -- if you have a Windows file you use Windows; if you're on an Apple, you use Apple. And the tool that I learned works the best was, if you're on Garmin, use Garmin.
Q That's fair. And so you used BaseCamp --
A Yes.
Q -- to just kind of look at this data.



Okay. But I guess the point I want to clarify and make sure that is clear here is, the maps that are on BaseCamp are not the same as the maps that are on the device at issue, correct?
A I would assume not, no. I didn't look at them. But no, it's a mobile device with, you know, whatever the mobile operating system is, versus the BaseCamp interface with Windows, I would imagine are two totally different things.
Q Okay. And so if we want to look at what maps are truly on the subject device, someone would need to download those maps, correct?
A Yes.
Q And as far as you know, that can be done?
A As far as I know. But, you know, there's some databases in there that I see, that there's probably a lot of data that I did not analyze because it wasn't relevant to my investigation.
Q That's fair. That's fair.
Going back to page 2, you did note that you used Google Earth Pro 7.3.6.9796. How did you use that, Agent Dugger?
A One, I think my original report, I probably had some Google screenshots in there that I removed. I tried to make this report summarize what would be a mountain of

data to where, you know -- we were going to release it to the public and for general consumption, so I think some of the maps were removed, and maybe some of them just didn't look good on Google Earth.
Q Was there a draft of this report?
A You know what, actually I know what -- let's see here. On page 46 is from Google Earth.
Q I was going to ask you about that.
A And it's not here, I don't think, but on the release there's a Google Earth -- on the release that we did publicly, on the Tennessee District Attorneys' Conference website there's a Google map that, for whatever reason, is separate than this that shows the road, the time, the text message, et cetera.
Q Okay. And again, you could download the data from this Garmin device into Google Earth and look at it as well.
A Yes.
Q You chose BaseCamp, but --
A Yes.
Q -- you could do it on Google Earth.
A Yes.
Q And the maps that are on Google Earth are not the same as the maps that are on the Garmin device, correct?
A Correct.



Q So if you want to know what's on the Garmin device, you have to look at the Garmin device, correct?
A Correct.
Q Okay.
A Correct.
Q Okay. And that just wasn't part of your charge.
A Correct.
Q Okay. That's fair.
A You know, during, I had debated -- but it would've required either buying another Garmin or putting the other Garmin back together, just to see what it looked like. But there was no point to our investigation of seeing what the actual maps on the Garmin device looked like.
Q That's fair. And I take it you did not, with your donor device at any time, or with any other Garmin device for that matter, go to the bridge and just ask the Garmin donor device to route you to the jail?
A I did not.
Q Okay. And you don't know what it would've shown?
A No.
Q Okay. If you'll look at page 22 of your report, Agent Dugger. I just want to get a -- make sure I understand the timeline here. So, your extraction was on May the 13th of 2024; is that right?



A Correct.
Q So that's right at two months after the accident, correct?
A Yes.
Q And you got this device about four weeks -- in our possession, about four weeks after the accident, correct?
A I'd have to go back and look at those dates.
Q Okay. Well, that's what I wrote down. It's in here, I know, somewhere. You --
A That sounds feasible.
Q It's in here. On March -- if you look at page 2, we know the accident was on February 14th, and it says, on March 19, I, Agent Dugger, picked up the Garmin device. So about four, five months -- excuse me. Four or five weeks after the accident is when you came into physical possession.
A Correct.
Q So for four or five weeks it sat in a floorboard, full of water and covered in mud?
A Correct. For a period, yes.
Q Right. And then from March 19th until May the -- let me go back to page 22. May the 13th you were cleaning it and drying it?
A Correct.
Q And then you did your extraction on May 13th?



A Correct.
Q Okay. You wrote -- I'm on the first paragraph there, Agent Dugger. You said, utilizing the Garmin Express backup feature, a backup copy of the device's data was transferred, and you downloaded some 87 million bytes of data, correct?
A Yes.
Q But you already told us you didn't download everything, correct?
A I downloaded what it would let me download.
Q Okay. That's fair.
A Whatever the proprietary Garmin software let me get from the device. It wasn't a, that I know of, a byte for byte copy of the storage on there.
Q Okay. That's fair. You did what you could do with your forensic machine that was -- and I don't mean to say it was easy, but it was easy to download without going to Garmin and saying, how do I get to --
A Yes.
Q -- anything else? That's correct?
A Correct.
Q Okay. And then you list all the files that you recovered.
A Correct.
Q So, you didn't try to obtain a byte by byte image

Q Okay. Now, you had commented that you could not tell from the black and white some information on figure 9. Can you see the color-coded one now?
A Yes.
Q Okay. I just want to -- now, this -- let's just make sure. So this figure is from Garmin BaseCamp, correct?
A Correct.
Q So the underlying map is Garmin BaseCamp, not the map that was on -- that is on the GPS device, correct?
A Correct.
Q And just so we're clear as to what this indicates, if we look at the -- see if I can push a pointer up here. Do you see my pointer on there?
A Yeah, I can see it now.
Q Okay. That's where he starts, the location of his home, correct?
A Yes.
Q And that's what this red line depicts?
A Yes.
Q His travel that night from his home to the Tri-County bridge, and then reversing back on the Tri-County bridge until he turns and heads back to Blythe Ferry Road, correct?
A Yep.



Q And that's -- all right. So he comes down -- and you'll have to forgive me, because I don't remember the names. I've been there but I don't remember the names of all the highways.
But he's coming down this highway, and he takes what you characterize and I think others have characterized as kind of a shortcut --
A Yes.
Q -- off the highway, down Gunstocker Road, correct?
A Yes.
Q And then he gets back on this highway, which -- is that 60?
A 60, yes, sir.
Q Okay. And he gets back onto Highway 60 after he cuts off this, basically this bottom distance, and then he goes back all the way to Tri-County bridge, correct?
A Correct.
Q And then the data shows how long he's at the Tri-County bridge. Then he -- at some point he voice radios, you know, "arrest," or "I'm leaving," or whatever he says. You've listened to it.
A "One in custody, transporting."
Q And just so we're clear, he then goes back, at least partially, down 60, but he doesn't go all the way back to the way he came, correct?



A Correct.
Q He turns left, for whatever reason, sooner than he otherwise would have going to the jail, correct?
A Correct.
Q And then he makes another left turn, which is exactly the opposite way of where he should be going to -- if he was going to go to the jail, correct?
A I don't know if I'd say the exact opposite, but very the wrong way.
Q The wrong -- that's fair enough. When he made this left turn onto Blythe Ferry heading back towards the boat ramp, that is not the way you would go if you were going to go to the jail?
A No, sir.
Q Okay. And the data that you recovered from the device showed that the device had been down Blythe Ferry Lane to the river at least two other occasions, correct?
A Correct.
Q And at each occasion that it went down that road, it got to the boat ramp and did a 180-degree turn and came back, correct?
A Yeah. Or just -- or maybe just before the boat ramp, if I recall correctly.
Q Okay. But regardless, Officer Leonard's device -- and I assume he had it, but that's an



assumption, at the time -- had made its way down that road a couple of different times before and turned around?
A Correct.
Q And if you look at figure 10 on page 39, that again is a BaseCamp drawing --
A Correct.
Q -- or a mapping, correct? Not the Garmin device itself.
A Correct.
Q Okay. The same with figure 11, that's a BaseCamp drawing and not a Garmin --
A Correct.
Q -- the actual Garmin device.
A Correct.
Q And this one actually shows some travel arrows of the way he went.
A Yes.
Q And the way he could've gone back, towards the jail.
A Correct.
Q Okay. And figure 12 on page 41 also is the Garmin BaseCamp and not a map from the device itself, correct?
A Yes, sir.
Q And I think you've said that the data that you

recovered showed that he traveled that intersection where he turned left from what I think is Blythe Ferry Lane and Blythe Ferry Road, he'd done that at least eight times before, correct?
A Yes, sir.
Q Okay. So at least that device had been at least eight times to that location. So somebody, assuming it's his device and he's in the car, he's familiar at least with that intersection because he's been there at least eight times while the device is turned on.
A Sure. And just knowing what we know, that this was his area of assignment, yes, his GPS and his car, was likely him driving the vehicle.
Q Gotcha. Gotcha. Okay. And if we look at figure 13 on page 42, this shows some of the data that you retrieved from the actual device, only displayed on a Google Earth map, correct?
A Yes.
Q So, to my question earlier, it depends on what underlying program you're loading the data into depends on what you're going to actually see, bridge-wise or not, correct?
A Yes.
Q So when you load the same data that you recovered onto Google Earth, there's no indication whatsoever that



there's a bridge at the end of Blythe Ferry Lane, correct?
A Correct.
Q You said -- on page 41, you wrote: "The data was plotting on Google Earth due to its demonstrative accuracy versus that of BaseCamp." Do you see that?
A Yes.
Q What did you mean by that?
A Well, if you look at page 42, the satellite overview, it shows what the terrain and the roads and everything actually is, not just a model map like on BaseCamp, or even on Google Maps not using satellite mode.
Q Gotcha. It's just more accurate --
A Yes.
Q -- to look at it?
A Yes. It's a picture.
Q Right. Exactly. Whereas, you call BaseCamp just a model map.
A Correct.
Q But again, neither Google Earth or BaseCamp map is demonstrative necessarily of what's on the actual device itself, right?
A Correct.
Q We'd have to download the maps from the device to



see what they show.
A Correct.
Q And if we -- you already talked about your data validation and how it matched up.
Let me go to the iPhone on page 45. Now, you didn't do the download from the iPhone but you looked at 75-plus pages -- 75,000-plus pages of it and pulled out what you thought was helpful to validate, correct?
A No. So, I actually reprocessed it with my own tool, which, depending on your settings, would give you something similar. But as an actual forensic examiner, I would prefer to parse the data myself.
Q Gotcha. So that's what you did?
A Yes, sir.
Q Okay. And if you look at page 46, the drawing doesn't have a figure number but that's -- is this a depiction of the data that is from Officer Leonard's cell phone the night of the accident?
A Yes.
Q And it generally then correlates with the GPS data that you downloaded, correct?
A Correct.
Q And you write, at the bottom of page 46, "Data recovered from the device suggests that Leonard used iOS maps to navigate to the area of Blythe Ferry."



Did I read that correctly?
A Correct.
Q And am I correct in understanding that what you're saying is that the data indicates that Officer Leonard used his cell phone mapping to get at least to the area of Blythe Ferry?
A Correct.
Q And there was a question about how -- you were asked previously about whether or not there was a place to hold the device somewhere on the car. But he could be -- isn't it true, with an iPhone you could be using your mapping to navigate by voice as well, correct?
A Correct.
Q And your cell phone will tell you which way to turn.
A Correct.
Q You don't have to be looking at it.
A Correct.
Q I mean, he could have it in his pocket and it could be saying turn left here.
A Correct.
Q Tell me what -- I'm on page 47. I don't know what you're telling me here at the top. What are the indications here at the top?
A So that goes with the -- let's see here. That

Page 174

talking about, where it shows an artifact, does it necessarily say it's real time, like it's connected now, or something in the past?
A It should tell you -- depending on the artifact, it often will tell you when, the actual time and date.
Q And the time on there that you're reflecting -- or looking at, is that -- well, strike that.
I don't think I have anything else.
A And just -- there's "what if's" on top of this. So, you can be connected to a Bluetooth device but have your settings where really nothing goes through, you're just connected to it.
Q That's what I was going to ask you about that.
So, simply because, you know, I put on there and said, hey, Bluetooth, I could walk away from my device, it'll still show, like, hey, I'm connected to a Bluetooth, right?
A Correct.
Q Whereas, the Bluetooth was probably never in my car to begin with.
A Correct. And one reason that I would -- I guess, you know, for me, just thinking -- and this is an unanswered question, but if you're transporting an inmate, I'm not sure why you would talk with people or broadcasting over your car.

Page 175

Q Where the suspect could hear you talking?
A Uh-huh.
Q And that's because of safety concerns, correct?
A Correct. Confidentiality and you name it. Professionalism. But maybe it's possible.
MR. FLORES: All right. That's all I've got. Thank you.

RE-EXAMINATION

By MR. KELLY:
Q Agent Dugger, this is Don Kelly with Garmin. I've just got a couple of quick questions.
One, I don't really understand your verbiage. I guess I should've asked you this before. But on the last page of your report, you've been asked about this, with the phone entering a lock state at 10:03:36. What does that mean, to enter a lock state?
A So, you have your smartphone out, you're using it, you can swipe the screen, you can open apps. You push the button or it hits the whatever amount of time you have it set to close, it goes into a locked state where you have to enter some sort of credential to get back into it.
Q Okay. So that could just be a -- it could be a manual you've done it, or X number of seconds you haven't done anything and it goes locked and then the screen goes

Page 176

dark, and if you want something else you've got to push a button?
A Correct.
Q Or talk to it.
A Yes.
Q Okay. Thank you. Last question. You were asked by Mr. Ward a question of -- I think it was Mr. Ward, it could've been someone else, I apologize -- whether you uncovered any facts that Officer Leonard might've done something. Let me ask you a question. In your investigation and your download of data, did you uncover any fact that you believe led you to the conclusion that the operation of the Garmin device, the subject Garmin device, played any role in this accident?
A No.
MR. KELLY: Thank you. That's all the questions I have.
THE REPORTER: Mr. Hoss?
MR. HOSS: I'm good.
(Signature reserved.)
DEPOSITION CONCLUDED AT 3:14

Page 177

REPORTER'S CERTIFICATE

STATE OF TENNESSEE:
COUNTY OF HAMILTON:

I, Sheila D. Wilson, Licensed Court Reporter #268 and Notary Public, in and for the State of Tennessee, do hereby certify that the deposition of AGENT CORTNEY DUGGER was reported by me in machine shorthand, and that the foregoing 176 pages of the transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this case.

I further certify that I am duly licensed by the Tennessee Board of Court Reporting, as evidenced by the LCR number and expiration date following my name below.

In witness whereof, I have hereunto set my hand this 3rd day of August 2026.

Sheila D. Wilson, LCR #268
Expiration date: 6/30/2028.
Notary Public Commission
Expires: 1/17/2027.