**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**CHATTANOOGA**

| | |
|---|---|
| **TABITHA MARIE SMITH (Deceased) (aka Tabatha Marie Colbaugh), by and through her surviving children NATHAN ALEXANDER SMITH, JE through next friend JH, NR through next friend SR, and LC through next friend EH,**<br><br>**and**<br><br>**NATHAN ALEXANDER SMITH, JE through next friend JH, NR through next friend SR, and LC through next friend EH, (individually),**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**GARMIN INTERNATIONAL, INC.**<br><br>**Defendant.** | **CIVIL ACTION NO.1:25-CV-50**<br><br>**JURY DEMAND** |

**DEFENDANT GARMIN INTERNATIONAL INC.'S**
**STATEMENT OF MATERIAL FACTS**

Pursuant to District Judge Clifton L. Corker's preferences regarding summary judgment motions, Defendant Garmin International, Inc. ("Garmin") by and through counsel respectfully submits this Statement of Material Facts, setting forth all facts as to which Garmin contends there is no genuine issue for trial.

1. On the evening of February 14, 2024, Meigs County Sheriff's Deputy Robert Leonard ("Deputy Leonard") arrested Tabitha Smith ("Ms. Smith") near the Tri-County Veterans Bridge on Highway 60. ***See* Doc. 1, Compl., at ¶¶ 14, 20.**

2. After arresting Ms. Smith, Deputy Leonard proceeded to drive Ms. Smith to the Meigs County Jail. ***See*** **Doc. 1, Compl., at ¶ 22**.

3. Ms. Smith was handcuffed in the back seat of Deputy Leonard's patrol vehicle. ***See*** **Doc. 1, Compl., at ¶ 25.**

4. On the evening of February 14, 2024, Deputy Leonard drove his patrol vehicle into the Tennessee River at the Blythe Ferry Boat ramp located at the end of Blythe Ferry Lane. Both Deputy Leonard and Ms. Smith drowned. ***See*** **Doc. 1, Compl., at ¶¶ 28-30.**

5. Plaintiffs filed a lawsuit against Meigs County in the Eastern District of Tennessee, styled, *Smith v. Meigs County*, No. 1:24-cv-151-DCLC-CHS, setting forth the below allegations in their Fourth Amended Complaint. ***See Smith v. Meigs County*****, No. 1:24-cv-151-DCLC-CHS, Doc. 102.**

a. At all relevant times, starting at 1663 feet from the start of the ramp into the river, on the right side of the roadway was a yellow highway sign that reads "ROAD ENDS 1500 FT." **Doc. 102, at ¶ 30.**

b. At all relevant times, at 1363 feet there was five rumble strips that span the width of the travel lane going towards the river. These strips were raised asphalt that measure approximately 3/16" high. **Doc. 102, at ¶ 31.**

c. At all relevant times, at 1261 feet, there was a yellow sign with a pedestrian walking on the right side of the roadway. **Doc. 102, at ¶ 32.**

d. At all relevant times, at 1072 feet and 740 feet were another set of five rumble strips measuring approximately 1/4" high and then 1/2." **Doc. 102, at ¶ 33.**

e. At all relevant times, at 546 feet, on the roadway, in very large letters, was the word "STOP." At t [sic] 502 feet was a yellow highway sign on the left side of the road that said, "STOP AHEAD." **Doc. 102, at ¶ 34.**

f. At all relevant times, at 498 feet, on the roadway, was the word "AHEAD." The wording on the actual pavement was obviously worn but visible. This was the last signage that was observed leading up to the water. **Doc. 102, at ¶ 35.**

g. At all relevant times, two more sets of rumble strips were present before reaching the water. One at 474 feet which measured approximately 5/8" high and the other at 236 feet that measured approximately 1/2" high. **Doc. 102, at ¶ 36.**

h. Upon receiving the call, at 9:32 pm, Leonard reported to Meigs County dispatch that he was enroute to the call scene. Leonard operated a police vehicle that did not have an operating speedometer, odometer nor any navigation equipment. **Doc. 102, at ¶ 41.**

i. Between 9:53:38 pm and 9:59:32 pm Leonard is using Facebook messenger to communicate with Ben Christian while driving the patrol vehicle with the Deceased restrained in the back seat. **Doc. 102, at ¶ 46.**

j. At 10:03:12 pm, Leonard sent a text message to his wife (who Leonard identified as "Hooker") via a cell phone with the content, "arrest." This was 46 seconds before hitting the water, while driving the patrol vehicle at 44mph – 56 mph with the Deceased restrained in the backseat. **Doc. 102, at ¶ 48.**

k. Based upon information and belief, the County failed to properly train and supervise Leonard in how to respond to calls and travel with prisoners in his custody. Leonard's speed going to the incident scene on the bridge was well beyond

reasonable and necessary. Leonard's speed with the Deceased in his care and custody, on a roadway that he was unfamiliar with, and (as noted by the District Attorney for the 9th Judicial District) on a "dark and foggy night" reflected the lack of the County's training and supervision of Leonard. **Doc. 102, at ¶ 61.**

l. Leonard also chose to ignore the rumble strips and signage warning of the impending Tennessee River. **Doc. 102, at ¶ 84.**

6. Approximately one month after the Accident, personnel from the Meigs County Sheriff's Office informed investigators that they had observed a GPS device while recovering the patrol vehicle from the river. ***See* Ex. 2, Agent Dugger's Report of Forensic Findings, at 2.**

7. Investigator, Agent Cortney Dugger, an agent for the Ninth District Attorney's Office and task force officer for the Federal Bureau of Investigation, subsequently located a Garmin Drive 52 EX (the "Device") on the driver's seat of the previously water-submerged patrol vehicle. ***See* Ex. 2, at 2.**

8. The Device was waterlogged and caked in mud. ***See* Ex. 2, at 3.**

9. To recover information from the Device, Agent Dugger disassembled the Device, dried and cleaned its internal components, transferred the printed circuit board into a donor Garmin device, and extracted the available data. ***See* Ex. 2, at 3-22.**

10. Agent Dugger explained in his deposition that the data extraction he performed did not include the extraction of any map images displayed on the Garmin Drive 52 EX found in Deputy Leonard's vehicle. ***See* Ex. 3, Agent Dugger Depo., at p. 112-115.**

11. Agent Dugger explained in his deposition that when he downloaded the data from the Device, the download produced a variety of data points, and he used Garmin BaseCamp to visualize these data points. Agent Dugger acknowledged that the "mobile operating system" of the Device "versus the BaseCamp interface with Windows, . . . are two totally different things." **Ex. 3, at p. 112-113.**

12. Agent Dugger explained in his deposition that to look at the actual maps on the Device, one would have to download those maps; Agent Dugger explained that he only extracted data from the Device. He did not extract the original map images located on the Device. ***See* Ex. 3, at p. 113, 115.**

13. Figure 2 in Plaintiffs' Complaint was copied from one of the maps produced by Agent Dugger and provided in the report of Agent Dugger's forensic findings. The figure specifically notes it as "Map from Garmin BaseCamp[.]" ***See* Doc. 1, Compl., at ¶ 26.**

14. Agent Dugger explained that the map images he created in BaseCamp are not the same as the actual map images contained on the Device. ***See* Ex. 1, at p. 112-115, 125-128.**

15. Pursuant to a Court approved Agreed Forensic Protocol, the parties created a complete forensic image of the Device on March 23, 2026, and all Parties have been in possession of a forensic copy of the Garmin Drive 52 EX since that date. *See* Doc. 59, Joint Motion to Amend Scheduling Order, Page ID # 525.

16. Plaintiffs' expert, Robert Draper, attended the March 23, 2026 forensic acquisition.

17. The Amended Scheduling Order entered on June 17, 2026, required Plaintiffs to serve their expert report(s) by September 15, 2026. *See* Doc. 62, Amended Scheduling Order, Page ID # 541.

18. Plaintiffs never served an expert report.

19. Garmin's forensic expert, Jeffrey Martin, conducted a forensic examination of the Device and determined that the Device's stored mapping data and map images did not depict or provide guidance to a bridge crossing the Tennessee River at the location of the Accident. **Ex. 1, Martin Affidavit, at ¶¶ 17-20.**

20. Jeffrey Martin's testing further confirmed that when the Device is in active routing mode, the Device provides four separate route guidance warnings, both visual and audible, and instructions inconsistent with continuing along that path into the Tennessee River at the end of Blythe Ferry Lane. **Ex. 1, at ¶¶ 28-31.**

21. Jeffrey Martin's forensic analysis additionally confirmed that the Device was not operating in active route mode on the night of the Accident. **Ex. 1, at ¶ 29.**

Respectfully submitted,

***/s/Donald J. Kelly***

Donald J. Kelly (Pro Hac Vice)
**BRICKER GRAYDON WYATT, LLP**
400 West Market Street, Suite 2000
Louisville, KY 40202
(502) 589-5235 / Facsimile (502) 589-0309
dkelly@bricker.com

**BRICKER GRAYDON WYATT, LLP**
333 Commerce Street, Suite 1050
Nashville, TN 37201
(615) 244-0020 / Facsimile (615) 256-1726
jbradshaw@bricker.com

Emma M. Weintraub (Pro Hac Vice)
**BRICKER GRAYDON WYATT, LLP**
6070 Poplar Avenue, Suite 300
Memphis, TN 38119
(901) 537-1020 / Facsimile (901) 537-1010
emweintraub@bricker.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and served electronically upon the following via the Court's ECF system on this the 15th day of October, 2026:

Robin R. Flores
**FLORES LAW OFFICE**
4110 Brainerd Road, Suite A
Chattanooga, TN 37411
robin@robinfloreslaw.com
*Attorneys for Plaintiff Nathan Smith*

Jeffrey W. Rufolo
**SUMMERS, RUFOLO & RODGERS, P.C.**
735 Broad Street, Suite 800
Chattanooga TN 37402
jrufolo@summersfirm.com
*Attorneys for Plaintiffs NR, JE and LC*

W. Neil Thomas, III
Michael Mason Thomas
**THOMAS & THOMAS**
6148 Lee Highway, Suite 1115
Chattanooga TN 37363
wntthomas@twtlawfirm.com
mthomas@twtlawfirm.com
*Attorneys for Plaintiff Nathan Smith*

Alyson Oliver
**OLIVER BELL GROUP**
50 W. Big Beaver Road, Suite 200
Troy, Michigan 48084
Notifications@oliverlawgroup.com
aoliver@oliverlawgroup.com
*Attorneys for Plaintiffs NR, JE and LC*

***/s/Donald J. Kelly***